Judge Weiss, can you see and hear us? Yes, I can very clearly. Thank you. Very good. This is a matter of Pet Food Products Liability Litigation. First to argue is Mr. Norderhoff. Perhaps, I'm sorry, before you start, before you use up your time, and we'll likely be giving the parties more time than is designated here, I wondered if we could get a few basic facts. We know how many claimants there were just before the time of the, at the time of the fairness hearing, but as I gather, there was another month or so before the bar date took place. And I wondered if anyone here can tell us how many claimants, total claimants there were on the recall and the refund, and how many total claimants on the injury and what the combination numbers were as well. Does somebody have that figure? Yes, Mr. Weiss, why don't you come on up? Just give us that information. Your Honor, I'm going to need the help of my co-counsel, Russell Paul, with some of this, but I have the food purchase numbers. All right. With respect to all claimants who made claims involving food purchases, there were 11,871. Okay. So that includes both food purchase only claimants and food purchase plus those with other economic damage. All right. Okay. So that's the total universe of claims for those who sought reimbursement for food purchases. Okay. I need to point this out because this is very significant. Out of the 11,871 food purchase claimants, 10,217 submitted claims for those food purchases without documentation. All right. That was the next question. Yes. So that's 85 percent, a little bit more. For food purchase only, there were 585 claims. Ninety-eight percent of those claims were without documentation pursuant to the provision in our settlement agreement that permitted up to $900 in undocumented damages, meaning that 98 percent of the claims submitted for those who only sought a recovery for food purchases, 98 percent of those were undocumented. Okay. Good. Is there anything else? Go ahead. I'm not sure exactly what you mean, Your Honor, but there were 24,155. I'm sorry. Why don't you come up here? Because we couldn't get this from the record. Go ahead. There were 24,155 timely claims total, Your Honor, comprising both the U.S. and Canadian claims. All right. Very good. I have other dissected Well, there were 22,420 timely U.S. claims and 1,755 timely Canadian claims. All right. And there were 1,066 late U.S. claims and there were 65 late Canadian claims total. Okay. Good. Good. And should any parties contest those figures, we'll be happy to send us a letter advising us that they're wrong and why they're wrong. There may be one other piece of information. Ken Wexler again, Your Honor. Yeah. The total recognized claims for those making food purchase only claims was $36,524.79. Say that again, please. $36,524.79. Okay. This is out of a submitted claims of $149,756.20. But our administrator, pursuant to the guidelines, was directed to take a pencil to the claims. They had to pass a reasonableness test. And these being undocumented claims, we ended up with a total recognized claim of the $36,524.79. Okay. What about the other total for food purchase claims? Is there a number for that as well? In other words, ones with injuries? In terms of dollar figure, it came up to $36,000 for food purchase only. I don't have the dollar figure on me, and maybe Mr. Paul does, but I know that the food purchase claim recovery is going to be about 37% of the amount claimed. And we don't have a number for that, I guess. We might. I can give you the number for the total damages that have been recognized by the claims administrator for all the timely submitted claims is just over $29 million. Well, I think isn't an issue here sort of which pocket you're reaching into? Is it the food one or the damages one? So we're trying to figure out, if we have an idea, if we can quantify what the food is. All food purchase claims will receive approximately 37% of their damages of the amount claimed, whereas those who made food purchase and had other economic damages will receive about 50% of their claim. Anyone have any contrary information or wish to contest those figures? D.J. Powers, your Honor, I just want to clarify. None of those numbers are in the record. None of those numbers have ever been provided to us. This is the first time we've ever heard them. And so we're sort of at a loss here, because I thank you for being able to write the letter to challenge those, but we have absolutely no basis to do that. All we have is some numbers that have been given for the very first time here today. So we're sort of at an unfair loss at this point. Well, good. Let's try to figure out a way where, if we're going to use these, that you have an opportunity to see what the story is. It struck me that if the fairness hearing had been held after all the claims had been made, obviously late claims excluded, that we would have had these figures in the record. But that was not the case. But if there is record evidence of this, it seems to me it's significant. And let me suggest that the plaintiffs and defendants here provide this information to you by writing and also to me, and then you can let me know whether you agree or not. Now, you may need to verify that somehow. And it seems to me that if the plaintiffs and defendants are relying on this information, you ought to have the same – you ought to be aware of this information. If I could make one more suggestion, Your Honor. This is an issue really across the country with claims. Some district courts have claims and before the fairness hearing. In my opinion, I think it's very important information to know. I've been involved in a class action where the claims were known before the fairness hearing and $5,000 worth of claims were made. And that would be important information for the district court to know. And then sometimes you have cases like this one where it's done after. And any guidance the court could give to district courts that perhaps this sort of problem would be resolved in the future by going that other process, I think would be a good idea. I understand your argument. One point. These numbers – Ken Wexler. I'm sorry, Your Honor. These numbers were just finalized last week. All right. Our view is it doesn't change the analysis. No, but can you verify this? Can the objectors have the opportunity to verify these figures? Certainly. And how would that be done? I don't know. We can simply give them the same numbers that were given to us by the claims administrator. Well, they may want to talk to the administrator or see the administrator's figures. We'll have to explore that, Your Honor, because I remember negotiating as part of the settlement with the defendants in terms of who had what input with respect to what the administrator's decisions were. But we will provide whatever information we have. The facts ought to be the facts. There shouldn't be any dispute about the numbers here. That's right. And there are disputes about other matters. Oh, no. We will be sure to make sure that they have the same information that we have. Very good. Thank you. If I could add just one point to that, Your Honor. This is Kyle Morderhough. Excuse me. Can you just say your name again? Because this transcript ends up just a bunch of lawyers talking. Yes. This is Kyle Morderhough on behalf of appellants Icus and Caffer. One fact on the claims amounts that was elicited at that oral argument before the district court was that the average was $75 per food purchase claim. So if you take the $11,000, I mean, obviously, there's some, as they call it, penciling by the claims administrator of that amount. But it would seem to correlate to 37%. You had 75 times. Well, there was a figure of, what, $9,600 plus at the time of the, at least on the refund claims at the time of the fairness hearing. So we've got roughly another $2,000 or so. No, the number was $6,200 at the fairness hearing. Oh, it was only $6,200. And the only number we had was that it was approximately, by our rough calculation, $450,000 in purchase claims at the time. Now it looks like it's closer to $800,000, $750,000, Your Honor. Good. Thank you. If I could, may it please the Court, my name is Kyle Morderhough. I'm attorney for the appellants Caffer and Pikus. Because of the division of time, I'm going to focus on the reasonableness. It's not to be construed as a waiver of my other arguments. Counsel will be addressing some other points at the other appellant counsel. I became involved in this when the cases I had in front of the Ninth Circuit, I found out, were being resolved for $250,000. And I knew this wasn't going to be reasonable because I had done discovery against one of the minor settling defendants, and the recall claims alone during that period were $900,000 for one settling defendant. And that's the hard numbers, and that's in the record, Your Honor. The issue I'd like to discuss before the Court is the reasonableness. I mean, can a district court approve a class settlement without independently analyzing the value of the settled claims? Were they to be successful at trial? We've talked about the claim amounts, but I think it's important. This Court's decision in In Re General Motors pickup fuel tank products liability litigation that established that you're supposed to be looking at – and I agree the claims information is important, but you're supposed to be looking at what the value of these claims are at trial. And the fact that we have a claims rate and we can toss about numbers, but I mean the claims we see are only going to be a percentage of what the actual value of these claims are. I believe the words of this Court were, the present value of the damages claims would likely recover if successful. And I would say that's an important thing for the Court, as all courts acknowledge, is acting as a fiduciary in approval of these settlements. And the record in front of this Court shows that there was no analysis of the present value of the damages claims would likely recover. Can I just ask you, I mean, maybe you can clarify this. Now we have a record, and assume it's true, I mean it's accurate. I mean it looks like they said $36,000 in food purchase only claims. Isn't that well within the amount of money that was set aside for it? No, they're using – that number is only for the food purchase claims. The people who also had damages with injured pets and make food purchase claims also account for that. That's why there's a 37% proration of these claims. Gotcha, okay. And remember here, these people are getting 37% of a claim that I would submit they should get 100% back on. I mean, the product was recalled, it was no good. They're entitled to all their money back. And the fact that it's being prorated at all is – To what extent do you factor in the – this doesn't go to your argument of what the district judge should have – what information the district judge should have gotten, but in terms of the reasonableness, don't you have to factor in the risk of establishing liability? My position on this is, according to the defendants, a lot of people went back and got 100% from their retailer or from the manufacturer. And if the manufacturer and the retailer are saying recall, that's 100%. You don't go back to the store and get half your purchase price back. And the same should be true here. Well, but I mean there are good business reasons for a retailer to refund. And it may have some bearing, but still I'm not sure that that's a dispositive issue when it comes to the reasonableness here. Let me comment on that, if I could. As we see here, the proration of these product purchase claims is more than the highly speculative injury claims that have causation problems under AMCAM. These have a much higher risk, as counsel readily admitted at the hearing, and all sides agreed. And yet they're being prorated less than the far more sustainable claims for either running back or recall. And one of your principal positions is that you don't have to prove really anything except that you bought or at least make a claim. You don't even have to prove it. You can make a claim that you bought certain food, and so therefore there's nothing to prove. But don't we have to start off with the underlying cause of action and the fact that you've got to – and maybe damages as well. And why can't a defendant settle a case, just say, look, we don't know whether we're right or wrong or liable or not liable, but we're willing to give you $75, $900, whatever it is, just to make this – just to settle this case. And tell me what's wrong with that argument. A defendant can do that, Your Honor. The point here is that the plaintiff who represents the class is in a position where they need to maximize that recovery. And I would submit that taking 30 cents on the dollar, or even less because we know some of the claims have been penciled already, that taking 30 cents, 37 cents on the dollar is not reasonable when a whole other group is getting 50 cents on the dollar or more of a far more speculative claim. You have to risk rate these things. I mean, we do it all the time. But you have to picture here, a defendant is now getting – not only are they getting a claims-made process, they're not having to refund all the money they made from selling a tainted product, they're getting a claims-made process, and they're getting it risk rated. And so really they're taking it both ends here. And that's the role of the court and the role of the class counsel and the need for separate representation. I think you're identifying exactly what the issue is that the counsel behind me will be speaking to. And I just think the crucial point here is that you have to have sales evidence. Proving of damages in this case, it could be quite simple. It could be a delta between what were the sales, what were the point-of-sale refunds, and that's your damages. That's your cost damages. The defendants and plaintiffs will argue this is really difficult to get your arms around, but I guarantee you every one of the manufacturers and retailers, accountants, know exactly how much was sold and know exactly how much was refunded. I don't think generally accepted accounting principles allow you to not get your hands around how much inventory you've sold and refunded. You made a specific request for this information. I did. I did. Because I had obtained it in my litigation in the Ninth Circuit, and I made a request for it with the district court. And what did the district court – what was his response? The district court didn't address that issue. That's one of the points that we made, Your Honor, is that he didn't deny it. He didn't grant it. He didn't exercise any discretion at all at that point. And the opinion doesn't say anything. The opinion doesn't say anything. Perhaps he thought when he was denying my motion for leave to intervene that I wouldn't be entitled to it. But I think the point is true that this information is very important. I can't imagine how a court could approve a settlement. At least I wouldn't be able to in the Ninth Circuit if I didn't at least show the court how I arrived at this number. And, you know, $250,000 is just out of thin air. And it has to be based on something. It has to be – and it can't just be – at the time they negotiated, there was no claims information. You know, they're negotiating in a vacuum, and it needs to be based upon sales evidence and the refunds paid. And I'm sure there were a lot of refunds paid, Your Honor, but the point is we're operating blind here. The district court needs to know. You don't contest the $8 million that was the historic payments? I do contest it, Your Honor, because if you look at the definition of historic payments, those are not payments for product purchase refunds. Those are payments for – and I apologize, I don't have the quote right here with me, but I quote it in the brief. They're specifically – historic payments are specifically defined, and the definition does not include product purchase claims. It's more injured pet screening, vet bills, and that kind of – those kind of economic expenses associated with an injured pet, what you characterize as tort or personal injury-type issues. So those historic payments can't be counted towards it. Now, there are going to be point-of-sale and manufacturer refunds. But again, we don't know how much because nobody wants to put forward that evidence, and apparently the plaintiffs went into negotiation without even knowing that information. So – and I think that brings me to the next point, and if I could just have a couple minutes since we – the analysis is especially important here because there was no discovery performed. The settlement occurred before any litigation had occurred. It's an early-stage settlement. Well, the court recited that there was a great deal of informal discovery, and he recites the things that were done, and the plaintiffs and defendants do as well. All that – all of which related to the tort claims. All right. I think that – None of this related to the refund. If you look through, there's – nothing in the court's analysis relates to the product purchase claims and the $250,000 amount. Everything related to toxicology and causation issues and, you know, in truth, you know, that's what they were focused on. I think the other important thing is, as I said, the sales are quantifiable. I mean, these are hard numbers. We should be able to find them. And I think – I think the – another point I'd like to raise that wasn't really discussed in the briefs, but the burden here. The burden's not on me. The burden's on the plaintiffs to show that this is reasonable. We understand that. All right. Thank you. Let me ask Judge Wise if Judge Wise has any questions on this. No, not at this point. Good. Any other questions? We'll have you back. Thank you, Your Honor. Thank you very much. Appreciate it. Mr. Powers. Good morning. Good morning, Your Honor. D.J. Powers, on behalf of the appellants Jim Johnson and Dustin Turner. I would like to reserve five minutes of my time for rebuttal. I'm going to be talking about lack of adequate representation, and all those numbers you were talking about is irrelevant. But I did want to answer your question about the cause of action for people with refund-only claims. To me, there is no defense to that. If I sell you a product for $20, you get the product, and then I call you and I say, you know what? I think we may have contaminated that product. Don't use it. I see absolutely no defense to your claim back to me. I want my money back. I can't imagine a stronger claim that you could have against me if I sold you a product and then told you, wait a minute, that could kill your dog. Don't use that. What if you said, you know, this may have some toxic material, but we're not sure. You know, and just to be on the safe side, you might want to return it. We'll give you your money back. Is there a cause of action then in the sense that you mentioned it? If I throw the – many things could happen, right? One could – I send the product back, and they test it, and they find out, hey, you know what? It wasn't contaminated after all. I still have a claim. I didn't get to use my product. If I threw it away because, you know, it was cheaper to throw the dog food in the trash can than to go down to the post office and wrap it up and do all that stuff to bring it back or whatever I needed to do to get that money back, I think I have just as strong a claim. You sold me something that you told me not to use. What if I have no verification whatsoever that I purchased it in the first place? You know, I tossed it in the trash. I don't have my receipt. Can you just give me money back? Can I get that money back? That would be a question for a jury, right? If I have a claim that you breached your contract or you sold me something you told me not to use, and the defendant came in and said, well, you know what? We don't believe you threw it out. Well, that's what a trier of fact is for. Now, I may not have as strong of a factual claim in that case because I've got to prove that's what happened, but my legal claim seems to me is, you know, almost a slam dunk that you sold me something you told me not to use. I didn't want to get too far in there because that's not my topic, but I did want to address that issue. As I said, our main issue goes to, regardless of what the numbers turn out to be, was that there was inadequate representation of class as required by Rule 23-4A and for failure to appoint separate class representatives for subgroups within the class. I want to talk about five different – I'm going to listen first and talk about the five different independent reasons why we believe representation was not adequate. Number one will be the class members with and without personal injury damages should have been separately represented. Second, I will talk about class members in states that allow warranty claims against manufacturers and those in states that do not should have been separately represented. Third, I will show that lack of privity is a unique defense to some members of the class, so the class members to whom the defense does not apply should have been separately represented. Fourth, we will argue that claimants with fundamentally different legal theories, that is, tort claims on the one hand, contract claims for refunds on the other hand, should have been separately represented. And fifth, because the settlement fund in this case was capped, we're going to argue that groups with differing types of claims, not amounts, you know, I paid $20 versus $30 for food, but different types of claims, injury claims versus refund claims, should have been separately represented. So let me go to that first point, and that is where one subgroup has personal injury claims and the others do not, there should be separate representation. That, of course, is the very basic holding in the Supreme Court's opinions in Amcam and Ortiz. In Amcam, for instance, there were class reps who both had personal injury claims and who did not have personal injury claims. And the Supreme Court said there needed to be subclasses for each of those different groups. You can't have just class representatives who represent all the possible claims. You need separate class representatives and, as the court said in Ortiz, and separate counsel to represent those different groups, those with the personal injury claims. We understand that point. Of course, we're dealing here with settlement classes. How do you distinguish our warfare in case? Okay, well, first of all, Amcam and Ortiz were settlement classes, the exact same issue. And what the court said is that even though this is a settlement class, that that doesn't matter because you need adequate representation. And because there wasn't between personal injury and non-personal injury claims, they threw it out on that purpose. And what did the district judge say about that? In this case, the district judge said that the people with the personal injury claims also had refund claims, so it was okay for them to represent essentially both groups. And, of course, that's exactly what the court in Amcam and Ortiz said. No, that's not okay. Turning to warfare, there are several things in that case that distinguish. First of all, most importantly, at page 533 of the court, this court says that by the presence of sep – let's go back to the facts of that case. That case was a drug case where there were direct consumer class members and then the third-party groups. And the argument was these both should have had separate representation. And the court, of course, affirmed that settlement. But in doing so, it's exactly the reason they did that was there was separate representation. The court said, by the presence of separate counsel for consumers and TPPs, the existence of separate counsel provided adequate structural protection. That's the whole point in having separate representation so that, you know, with these competing two groups trying to get the money are separately represented. That's what happened in that case, and that's why it was okay in that case. That was one way to distinguish that case. Second, the court said in that case the named parties suffered the same injury resulting from the overpayment of the warfare and sodium and sought essentially the same damages by way of compensation for overpayment. Well, that's not the case here. They're not seeking just the same damages for overpayment here. I'm sorry. What they are talking about here is personal injury tort damages, which are completely different than contractual damages for refunds. And we understand that. Why don't you move on? Judge Wise has a question. Yes. I assume you're the right person to talk about it. I'm interested in the fee allocations here. Assume that an American has a refund claim of $100. His share of the fee would be $25. Is that correct? Are you referring to the attorney's fees? Yes, attorney's fees. I'm not sure exactly how that works under the settlement because we did not attack the attorney's fees. I know nobody attacked attorney's fees, but we have an obligation to look at them in this court as part of a settlement. And I had noticed that no one was taking care of the Canadian lawyers, getting, as I read it, 6% more than the American lawyers. Am I misreading the settlement? I'm not sure exactly the split and how that was between the lawyers. Perhaps the plaintiff's lawyers will be able to address that issue. Well, that's part of the adequacy of the representation here, is it not? It is. Are you conceding that the fees should have been allocated in that fashion? We have not taken any position on that part of the adequate representation. We have focused on the five matters that I've talked about. And who speaks for the litigants? No one, right? You mean the class members? Yes. Well, that's a great question. The idea is the class counsel speaks for the class members. The problem when you get to a settlement is that they have a perverse incentive to settle the case and get fees, and the class members who are not there could get hurt in the process. And that's exactly what happened in this case because their clients all had personal injury claims. And so they're – and they admit it to the court in the trial below. It's quoted in the briefs a couple times where they say, yeah, of course all our energy or most of our energy is going to be spent on these personal injury claims because their clients, their damages on those claims are exponentially higher than the refund claims. So I guess from a different angle you're getting to exactly the point that we're making, and that is that there should have been separate representation, both class reps and counsel, for this group that my clients are in, which is they only had refund claims. Those folks should have had separate representation, and your question is perfectly right. There was nobody there at the settlement or even before the settlement representing their interest. That's why we believe this court should reverse. Good. Why don't you move on to your other four points? I wanted to save five minutes for rebuttal. We'll give you – if you would briefly go through your points. Sure, I'll try to be super fast. Number two was the significant differences in state claims. I want to make it very clear we have not raised a predominance or manageability issue. The courts have been clear that even though you have a nationwide class, that's it. It's adequacy, which the AMCAM court has said adequate heightened scrutiny. Smith v. Sprint is a case you should look at in the Seventh Circuit that says, when you've got this difference in strength in claims, even in settlement, what's the difference here? Privity. Privity, that is, for the breach of warranty claim, which is your contract claim for folks. In states like Texas, privity is not required to sue manufacturers. In most other states, it's required. So in Texas and other states, they have a solid claim for breach of warranty that the other folks don't. So they should have been separately represented. And so how many subclasses do you think would have been proper in this case? We're looking at three subclasses. One is for the injury claimants. Second would be split between the refund-only claimants in states where privity was required and where privity was not required. That's what we would have recommended. The third issue is the unique defense. And, Chief Judge Sirica, your opinion in a case that was not cited in the brief, but Beck v. Maximus 457-291 held that class members to whom a major defense does apply are not adequate representatives for class members who that major defense does not apply. Again, the privity issue comes up. You've got somebody in a state where privity is required. That can't be an adequate representative for somebody in another state like Texas because that's a major defense that kills the client. To what extent does this fold into manageability? If you were to go to trial, that would be one thing. But if it's presented to a district judge as a settlement class, these are issues that don't come up. As long as the defendant is willing to pay and treat everybody equally. Because, Judge, it has nothing to do with manageability. It has to do with adequate representation. You can't know whether what's happening is fair or not. That's the whole idea of adequate representation. And what the Amcom Court and the Ortiz Court said is you need somebody in there who knows. Their duty is just to this subgroup. That's how you get adequate representation. Whenever there are differences in state laws on a settlement-only class, that would require separate counsel. I mean, if there are, say, ten different views, maybe if the states can be divided up five different ways or ten different ways, then we would have to have counsel for each of those groups. No, Your Honor. There's obviously a scale here. We are at one end of the scale, which is if you – I'll give you an example. You've got one group of states that say they've got a cause of action. The other group of states says there is no cause of action, no breach of warranty, and it's clear. To me, those two groups need to be separately represented. Now, there might be differences that, you know, well, you just need – you know, there's an extra element for this state and that state. Obviously, you don't. But for adequate representation, if there is a clear difference, one has a claim and the other doesn't have the claim, there needs to be separate representation. It has nothing to do with manageability. It has to do with fairness to those two groups to have adequate representation. The fourth, just quickly, the two different legal theories. Again, Chief Judge Strickland in Beck v. Maximus, you quoted a couple other cases that basically say for adequate representation you need the same practice or course of conduct plus you need the same legal theory. That's where, you know, you get your adequate representation. Of course, here we've got two completely different legal theories. It's as different as you can have, tort and contract. And then the last issue is the available funds issue where, again, sodium and also, in your opinion, prudential, both cases said, hey, there's no splitting of the settlement here of the money, so that's not a problem. We do have a problem here with splitting the settlement because they did limit one group but not the other group. Is this an adequacy of representation problem or is it an allocation problem that should have been dealt with at the fairness hearing? Well, I believe it's an adequacy. Or both? Well, it could be both, but I think it's sort of the tail wagging the dog. The idea of adequate representation is to protect from unfair things happening. The ultimate goal of the court should have been adequate representation so that we don't have these questions of fairness. If there would have been separate representation for these two groups, we wouldn't have arguments. If you were happy with the allocation, would you be raising the adequacy argument at this time? If I was happy with the allocation, as representing two particular clients, if they had gotten 100% of what they deserved, then, yeah, I don't know that they would have much of a claim at that point. I still think the district court in that case, however, still should have made sure on behalf of the rest of the class that those folks were adequately represented. All right. Good. Thank you. Thank you very much. We'll have you back on rebuttal. Mr. Wexler. May it please the court, Ken Wexler again on behalf of the plaintiff's employees. Judge Weiss, I want to answer your question. Judge Weiss? Yes, I'm listening very carefully. All right. The way the attorney's fees were apportioned, we applied for a 25% fee against the fund of $24 million. The Canadians, through our agreement, applied for a 6% fee as against the fund. So the total against the $24 million fund was 31%. They did not get 25 plus 6, just the 6. The total against the fund was 31%. Now, that did not include we waived what we believe is our right to seek a fee against the $8 million. Just a minute. You said the claim against the fund was 25% for attorney's fees, and the Canadians got 6% in addition to the 25%? Yes. As we explained in both the notice and to Judge Hillman, it was for a total of 31% against the fund. All right, so the fees here are not 25%, they're 31%. Yes, the American portion was 25%. I still don't understand. Why is it that an American purchaser has to pay 25 cents of a $100 claim and a Canadian purchaser has to pay $31, 31% of his $100 claim? No, both parties are paying 31%. 6% apportionment. Yes. All the class members, this being a cross-border settlement, all the class members are paying a total of 31%. There's no apportionment of an American fund and a Canadian fund. Fee-wise, there is. All right. So, wait a minute. So, of the $24 million settlement, 31% is allocated to counsel fees? That's correct, Your Honor. Not 25%. That's correct. We, as U.S. counsels, sell 25%. Was anybody there to contest the percentage of the fee that was given in this case? Nobody did, Your Honor. It was in the notice, though, both the 25% to U.S. counsel and 6% to Canadian counsel. How do you justify that? I realize there's been a tendency in the districts to award something around 25%, and I question that, frankly. It should be worked out on the basis of each case, not on kind of a flat arrangement that goes across borders. Why wasn't there somebody there to say 31% is too much in a case that never was litigated? Well, you ask a lot of questions in the one. I'll try to do the best I can. We gave notice to the world. We gave 30,000 direct notices plus publication notice across America and Canada, and people had the opportunity to object to that fee if they so wished. Nobody did. Now, Judge Hillman did not... Isn't the court supposed to look at, from the standpoint of the litigants, as the only person there to represent their interest in allocating such a large fee? I believe he did, Your Honor. Don't forget, we only sought a fee against the $24 million in new cash that we were able to achieve through the settlement. We did not seek a fee, though we discussed it internally, against the $8 million in historic payments that were made. I'm not interested in that. No, I'm interested in the 31% versus 25% of the fee, which you said was the net result. Yes. I'm not interested in the $8 million of historical settlements. I only raised the $8 million because a 25% fee, just speaking from the 25% standpoint, as against $32 million, would result in an 18.75%. And that's... Yes, but... But we did not... You didn't do any work at all for the $8 million, so why should you get a fee out of it? Well, we believe we did do work with respect to that $8 million. There was much evidence in front of Judge Hillman that these programs were put into place as a result of our litigation. And in an attempt to undermine the litigation. But I don't... I mean, that's not something that I want to argue here with you or the defendants, because we did reach a settlement. And to say that we didn't litigate, I don't know how many settlements involve 10 mediation sessions over an eight-month period. And it's important, with respect to the points made by both Mr. Norderhaug and Mr. Power, to understand that unlike a typical class case, unlike any class action I have ever been involved with, we had a huge set of data from which we could analyze the nature and extent of damage, both in terms of persons suffering economic injury, not tort claims. We didn't bring tort claims. These were all people suffering economic injury. And the relative value of those claims versus the food purchase aspect of those claims. What we engaged here in was an allocation, which, under Sendent, is perfectly appropriate. Under Sendent and Prudential. This isn't a $250,000 settlement of food purchase claims. This is a $24 million settlement of recalled pet food claims for which we allocated $250,000 to persons who also, in addition to their other damages, sought a recovery for their food purchases. So we have to step back a little bit and see this for what it is. We've seen a focus on the ninth birch factor with respect to one aspect of the allocation. And while, yes, we did not have discovery of the sales, which further litigation we could have gotten. But as the court pointed out in Sendent, discovery would not have shown us much more than we already knew. This is very, very important. If you look at, and I apologize, I have copies here of docket entries 36, 37, and 38, which are affidavits of three of the co-lead counsel that Judge Hillman had before him, reflecting a database in excess of 2,000 pet owners, which that's just among lead counsel. There were 120 different cases filed and persons, other plaintiff's lawyers who we had access to their database. And if you look as well to the joint declaration in support of the motion for final approval at paragraph 25, that we surveyed the data that we had available to us to determine the nature and the extent of damages that the members of our class suffered. The argument, as I understand it, the argument is that learned and experienced counsel made certain representations to Judge Hillman, which he pretty much accepted, but that there was no data to back it up in terms of the amount of sales and the amount of recalls and refunds. And in his opinion, it's a little difficult to see why he did not ask for that information. So to the extent you can explain it to us, I'll be happy to. In the course of living with this case over the eight-month period until this thing was resolved, and in the course of exchanging data in the course of these mediation sessions and consulting with our experts and our own clients, we were able to have an appreciation of the relative value of damage incurred by the various claimants in this case. We also understood and learned that these refund and exchange programs were an ongoing matter. If you look at the preliminary approval order, which is part of the appendix, one of the paragraphs, I believe it's the last paragraph, points out that to the extent the released entities are still engaging in reimbursement programs, they can continue to do so. We knew this was going on. We knew that food purchase claimants had access to 100 percent recovery. And so who did we try to protect? Why did we set any money aside at all for them? The beauty of this settlement, I will always maintain, is that we provided a benefit for those who couldn't prove their damages in a court of law, undocumented damages. And this money was set aside for people who, for whatever reason, threw out their receipts or threw out the food and couldn't go back to the store and take advantage of what was going on. And I believe the numbers I gave you bear this out. Those who made claims for food purchases, 98 percent of them sent in claims with undocumented damages. We proved ourselves to be right. But the point is, from an allocation standpoint, we felt that this was an appropriate allocation based on the information within our possession. Yes, we didn't take discovery of a sales number. Can't say that we did. But we certainly had enough data to know the relative value of the various pieces of data. But if you're going to cap, if it were uncapped, it would seem to me that you would look at this differently. But if you're going to cap the figure and then prorate the recovery. Well, Your Honor, I mean, as much as I, you know, this is a sensitive topic. But the issue of having undocumented damages brought with it the threat of overstated claims. Fraud. Yes. No, and that's reasonable. And it was a consideration that we gave. And we felt that a cap was necessary under those circumstances. We felt it was the appropriate cap. And frankly, with a 37 percent recovery rate for those with undocumented damages compared to most consumer cases, which the recovery rate can be anywhere from 5 to 10 percent, sometimes lower, we think we achieved a great result. But again, it's important to point out, we don't have tort claims here. We had breach of warranty claims all the way through. The problem with causation and proving damages, in fact, I believe it's in ascendant. There's a discussion where people claimed that those with Section 11 claims had slam dunk claims as compared to those with 10B claims. And the court pointed out, well, that may be true on a liability side. But from the 10B standpoint, those 10B claims are more valuable. So who's to say that's not the stronger claim? And we're not going to speculate. By the same token, in prudential, there were claims made by objectors that certain claims were stronger than others. And Your Honor would not engage in that sort of after-the-fact analysis. You have to look. You know, Mr. Narderhaug points out that there was no analysis of the evidence. But let's go back to the language of GM. The court analyzes the evidence and the surrounding circumstances. And the surrounding circumstances carried a lot of weight in this case. It wasn't a fast settlement. It took a year. We tried to settle it as quickly, as expeditiously as possible, but it was pretty hotly contested to be paying Eric Green over 10 mediation sessions. But this was a complete understatement to say that we were not engaged, if not litigation, in a courtroom. We were engaged in litigation in the mediation room. And while we did it, we hired experts and economists to look at Menu Foods' financial ability to withstand a judgment. We needed Menu Foods as a defendant to keep the class cohesive and get a result, a nationwide result, because without them, you've got an atomized class with different defendants all over the country, some having different levels of liability. We needed them as a defendant. We hired an economist to help us understand their financial condition. We hired toxicologists. We did surveys across the country of what treatments cost. I mean, this was not – we didn't walk into a smoke-filled room and sign a deal, which is spoken about in that community bank case, with a huge attorney's fee, because we're taking a negative multiplier here, as Ms. Yvette pointed out at the final approval hearing. This is not a case where the lawyers made out bandits because it wasn't settled early and without work. Why don't you address, or maybe your colleague is going to address, the specific points raised on the adequacy of representation? Well, I'm happy. Is another counsel going to do that? Well, she certainly will. Okay, fine. But since it's my adequacy, can I speak to it for one minute? Yes, of course. I trust Ms. Gailey implicitly. I'm sure she trusts you. Yes, okay. All right. We represented all people who purchased food. The court said in prudential that for there to be a conflict, it has to go to an issue that's at the heart of the litigation. And what was at the heart of the litigation here? It was recalled pet food. We represented all purchasers of recalled pet food. This was what bound this class together. Our interest, and Judge Hillman, in frankly an excruciating analysis given the information that he had, found that our interest in health was to maximize the recovery for all the members of our class. There was no conflict here, and we were more than adequate. And I'll leave the rest of my time. Can I ask you a question before you leave? Yes. I'm sorry, I don't know exactly which counsel on the appellee side said this. I was looking at the transcript, the appendix, page 179, and it said, the representation is made to Judge Hillman. I want to make sure that the record is clear. The $250,000 cap is only for people who purchased food and didn't suffer any injury. If they have, if you purchased the food and your cat got sick, you make a claim not under the $250,000 but go to the rest of the fund, the general fund. Is that accurate? No. That was a mistake, and Mr. Griffin, who's here, stood up later and pointed it out. Okay. All right. Thank you. At the long form notice, which, again, this is the docket at page 151-7, it couldn't be clearer. It says, if the $250,000 limit is reached, the part of your claim for reimbursement of recalled pet food purchases will be prorated. It's the part of your claim. The claim form also points it out. Okay. If a unit, that is an element of economic damage for everybody to ask for. Okay. Good. Thank you. Thank you, Mr. Wixson. Ms. Gately? Good morning. Good morning, Your Honor. My name is Mary Gately, and I'm counsel for defendant Apelli Menu Foods, and I'm also one of the defense liaison counsel in the case. Your Honor, if I could start with addressing the questions that have come up related to what evidence was in front of the court related to the adequacy of the $250,000. The first point I would make is that the court did not abuse its discretion in determining that the $250,000 was fair, adequate, and reasonable. I think you have to step back for a moment and understand the context of the recall. This was for a very limited type of food. It was for what they call wet pet food, not dry food, to contrast it. It was also for food that was manufactured over a very limited period of time, for a matter of months, in fact. So we're not talking about years and years of food that was recalled. We're talking about food that was recalled over a matter of months. The second point is that the district court had a lot of evidence in front of it that it considered in coming to the determination that the $250,000 was adequate. For example, the court considered that there was a lot of recalled food that never made its way to the shelves of the retailers. And in the record, in the supplemental appendix at pages 17 through 36, you see declarations of the manufacturer defendants that describe that food, and it's called the organized inventory. Again, by way of background, there was a whole proceeding in front of the court related to how much pet food needed to be kept for evidence because, as you can imagine, there was a lot of food that ended up back in the manufacturer's hands. And over time, the pet food deteriorates. And so there were motions that were made for protective orders to stop the defendants from having to keep so much food because of the burden associated with it. And so you'll see in that context this organized food that documented, never made its way to the retailer's shelves, pulled back before it actually made its way to the retailer's shelves. Another point. Do we know the net number of cans of food that got to the retailers? Your Honor, there's not good evidence of that, and let me explain why that is. Mr. Norahog suggests it's just a simple math equation between the number of pieces of pet food sold and the number of pet food returned. The nature of this small consumer good recall. Now, these cans of pet food are not $20 a piece. These are $0.30, $0.50 a piece, pieces of, you know, pet food. When they were swept off the shelves of the retailers, they were swept into cardboard boxes and barrels, and they swept off not just recalled pet food but non-recalled pet food because, of course, their interests. And, again, Chief Judge, you recognize this sort of public policy. You want to encourage people to do voluntary recalls. These things were all swept off of the shelves. In some cases, non-pet food was even included in this stuff. It was all shipped back in banana boxes and barrels to the manufacturers. And so within this mess of stuff was recalled food. The district court understood that you could never determine exactly how much food had been returned. So there was a, you know, the district court had to act within the uncertainty that it had. It could never have figured that out, and that evidence was before it. And, again, that's in the record at pages, supplemental appendix at pages 17 through 36, these declarations of the manufacturer defendants, and that's called the unorganized recalled pet food. The other important point, and I want to address this point. What about voluntary recalls? I mean, your adversary points out that should be a number that would be able to come up with immediately. Well, Your Honor, this pet food was distributed to many, many, many grocery chains. I mean, people come in to seek a refund. Just say, you know, I bought it at point of purchase. I bought it. Can I have my money back? And the money goes back. I think they're saying they don't even have those stats. Well, Your Honor, again, even if you – I think they used the example of if you could go into Walmart and get some figure just for Walmart. But that would be one tiny piece of an enormous puzzle that I think would be almost impossible to figure out. And, again, the reason is because the manufacturer defendants had these voluntary programs, you know, where you have 100% guarantee. So if you want to return the pet food to the manufacturer, you don't have to even go through the retailer if you want to. You can just call the manufacturer. And that's indeed what happened. People were, as of the point of the recall, very, very well-publicized recall. People were making point-of-sale returns to manufacturers and to retailers or exchanges even. So, again, that's another reason why you can't, you know, kick and tie down every piece of pet food. These are small consumer goods, 30-cent, you know, pieces of – Nonetheless, I mean, I'm not an accountant, but, I mean, wouldn't they have some statistics on that? I didn't really see much in that way in the record. Well, Your Honor, there was evidence in the record that $8 million were paid for these consumer programs that included the product purchase claims. But, again, these were settlements that the manufacturers and retailers were making with people and not designated. In other words, if someone comes in and says, look, I have a, you know, some product that I purchased. I also have a pet that got sick, and I lost time because I had to take off from work to take my pet to the vet. You know, my claim is $1,000. And so the manufacturer or the retailer says, okay, we'll pay you some amount of money for that. It's not kicked and tied down. Well, this amount goes to the product purchase claim, and this amount goes to, you know, the time that you had to take off from work. It's a holistic, we'll take care of you. You're our customer. You know, we'll take care of you. And so, again, Judge Hillman understood all of these points. He understood that the $8 million included these product purchase claims. And, again, that's in the Supplemental Appendix at the Declaration of Marty Hissong. That's Pages 1 to 11 of the Supplemental Appendix. In any event, as Mr. Wexler pointed out, the claim form, the judge understood and was put into the order at the preliminary approval that the defendants could continue to pay these claims out through. So for a year, from March of 2007, all the way through preliminary approval, the defendants are still making these kinds of customer satisfaction payments to their customers. So, in any event, Your Honor, I would submit that there was a great deal of evidence in front of the court that he considered in making his determination that the $250,000 was fair and reasonable. The other point I would make, Your Honor, is that the objectors suggest that they had a slam-dunk, sure thing recovery. And I would submit that they've underestimated their own risks of litigation, that it was a sure thing. If you look at the experience of the PICUS CAFER objectors, they had two separate cases. One's called the Kennedy case. One's called the PICUS case. In those cases, the only claim that they're making is for product purchase claims. And they were making them for nationwide classes, for just the value of the products. And in both of those cases, they were denied class certification. And in the case of the Kennedy case, they actually went up on appeal and the Ninth Circuit affirmed the denial. On predominance grounds? Yes, Your Honor. And similarly, in the PICUS case, which is in Nevada federal court, the court rejected class certification and the Ninth Circuit refused to take an interlocutory appeal on it. And it's now proceeding as an individual case in federal court in Nevada. So the experience alone of the objectors who have come here today is that you do not get certification of these kinds of classes. Yet they come here before you overestimating their chances of succeeding in a class action and also overestimating their damages. Well, they completely ignore the risks of certification. But I gather from their argument that it doesn't matter. They would say you look at the claim and at least the way we've compartmentalized the review of class certification and settlements, they're saying you only look at the claim. What's wrong with that? Well, Your Honor, I think they're also overestimating their percentage of recovery. In other words, if you settle a claim, you're not settling for 100% of the value of the claim. It's a settlement. And the very cases that they cite in their brief cite two affirmances of class actions where, you know, as little as 12% and lower are approved. In this case, as the evidence has shown that we started out with, a 37% recovery on a consumer claim is a good settlement. And this settlement was good for the people who, you know, incurred the losses. Again, I think you have to set – Well, their argument, I gather, is something like this. Company manufacturer issues a recall. The game is over. They've admitted liability. All you've got to do is show up. I'm entitled to 100%. Your Honor, I think your point earlier is exactly right, that by issuing a voluntary recall, they're not admitting liability. They're saying we think we have a problem. We're going to recall our food. Those people have a remedy, and they exercise it. They went to their point of sale, as well as the manufacturers and retailers having these customer satisfaction programs. They went and got that returned. At the point that you had the settlement, you had people with undocumented claims. Everybody who had good claims had gone back and returned their food. The reason that you have a cap is because you have a real chance of fraud with people coming in. And, again, there's nothing wrong with allocation. If you look at the insurance brokerage case, in that case, there was 51% allocated to the Zurich excess policyholders for a three-year period of time because those people had more damages than other people who had excess policies and who had non-excess policies. So there's nothing wrong with allocating these figures to, you know, where they belong. And in this case, you had very few uncompensated product purchase claims. And the evidence that I went through supports what the district court had in front of it. The question is, did he abuse his discretion in deciding that? And I would submit he didn't. What about these variations in state law? Your Honor. Privity and so forth. If you look at these courts' precedents on the adequacy of class representation, the differences in state law, you're right, could be dealt with if they went to trial in certain ways. The In re Prudential case suggested that they could be grouped by, you know, state law if you needed to in the case of a trial. Those were not significant conflicts of interest. The adequacy of representation claim has two prongs. One, did experienced class counsel represent the plaintiff? That has not really been disputed in this case. And the second point is, were the interests of the absent class members sufficiently aligned with the class representative? Were there divergent interests or conflicts of interest? And there weren't. You have to think of the class in a circle. Everybody was a purchaser, and then some people went on to use the food with their pets and may have incurred additional damages as a result of the use of the pet food. But everybody is in that circle who purchased and or then used. So those people had the same incentive to pursue their class claims for product purchase claims, for healthy pet screens, and for any sick and dead pet injury claims. This is no different than any of the cases that have come before this court before, in Ray Prudential, the insurance brokerage case. They're all arising out of this common set of nucleus of facts, and that's what Judge Hillman looked at when he decided there was no conflict of interest and there was no need for subclasses. You only get to subclasses if there's a conflict of interest between the class reps and the absent class members. And in this case, there was no conflict. There were no divergent interests. Everybody had the same incentive. They purchased the pet food, and they thereby gained entrance to the class and wanted to maximize all of their damages. The question is really the allocation. And, again, as I submitted before, the allocation was appropriate in this case. Anything else you want to tell us? I think that's it, Your Honor. Judge Wise? I have one question. Yes, one question. Ms. Kagan, what was all the trouble about the terms of the release? Why couldn't the parties get together and take care of the objections raised by various people that the release covered items that were not intended to be included in the settlement? Your Honor, the parties did get together. There was no misunderstanding between plaintiffs, defendants, or the district court on that release. One of the – and you'll notice it wasn't raised here, argument, because of something that's happened since then. The Pikus objectors, Pikus-Kafer objectors, had a case in the Ninth Circuit, this Kennedy case, in which they said that the release had been misused. That case went up on appeal to the Ninth Circuit, and the Ninth Circuit affirmed the denial of class certification, not because of the release in our case, but because of lack of predominance under Rule 23. The release was clear, Your Honor. It was tethered to key points, and the key points in the release were that you had to be a settlement class member and that you had to involve the purchase of recalled pet food. Recalled pet food, by definition, was pet food that was recalled after March of 2007 that had the allegedly contaminated wheat gluten. I understand that. I couldn't understand why there were any objections to reforming or redrafting the release to take care of the objections that were raised to the language. Well, Your Honor, I would submit there wasn't necessary to redraft. The release on its face was clear because it was defined that it only covered products that had allegedly contaminated wheat gluten or rice protein concentrate, by definition. I understand that. Are you telling us that there are no existing objections to the terminology of the release at this time? Your Honor, they did raise an objection, but the objection was considered by the court and rejected because the terms of the settlement itself were clear. Rejected by what court? By the District Court, Your Honor. Here, in New Jersey? Yes, sir, Judge Hillman. Didn't your adversary point out there was a point where at least one of the appellees had argued that the release did bar claims? It seems like they went back and forth on it, but nonetheless. Well, there was, and again, one of the parties, not one of the defense liaison counsel, who had this separate case, Natural Balance was the name of the party out in California, raised two arguments to the District Court for why he should deny class certification. And this was right around the time of the preliminary approval of our settlement. One of the issues that he raised was the release, and the other was Rule 23. The District Court found both grounds as the basis for his opinion. Then it went up to the Ninth Circuit, and the Ninth Circuit was very clear in saying that it was on Rule 23 grounds that they should deny class certification.